# IN THE COURT OF APPEALS OF IOWA

No. 19-2086
Filed May 12, 2021

**JERRY HOFFMANN and HOFFMANN INNOVATIONS, INC., d/b/a DIY AUTOTUNE,**
    Plaintiffs-Appellees,

**vs.**

**SCOTT CLARK and REALTUNERS, LLC,**
    Defendants-Appellants.

_____

Appeal from the Iowa District Court for Pottawattamie County, Susan L. Christensen (pretrial proceedings) and Margaret Reyes (pretrial, trial, and posttrial proceedings), Judges.

The defendants appeal from the $11,000,000 judgment entered against them, arguing they should get a new trial because the sanction entered against them was too harsh, the district court wrongly prevented them from presenting evidence to limit the award of damages, the damages awarded by the jury were improper and excessive, and the court's award of common law attorney fees was in error. **AFFIRMED.**

Matthew G. Sease and Kylie E. Crawford of Sease & Wadding, Des Moines, for appellants.

Robert M. Livingston of Stuart Tinley Law Firm, LLP, Council Bluffs, and Seth Katz of Shepherd Law, LLC, Atlanta, Georgia, for appellees.

Heard by Vaitheswaran, P.J., and Greer and Schumacher, JJ.

**GREER, Judge.**

"Falsehood flies, and truth comes limping after it; so that when men come to be undeceived, it is too late . . . ."[1]  This concern became central in a case that started as a relatively common dispute between an employer and a former employee.  Jerry Hoffmann is the chief executive officer of Hoffmann Innovations, Inc.,[2] which does business as DIY AutoTune.[3]  They are our plaintiffs.  Scott Clark, who worked for DIY AutoTune, was fired by Hoffman in August 2016.  Clark then started his own company, RealTuners, LLC.  They are our defendants.  Less than a year later, Hoffmann initiated a lawsuit, raising a number of claims addressing Clark's new company and a noncompete agreement Clark had signed; actions Clark allegedly took using confidential information and trade secrets from DIY AutoTune; and statements Clark had made on social media disparaging Hoffmann and his products and services.

A few months into the litigation, the parties asked the court to file a consent agreement "in an effort to narrow the scope of litigation and avoid additional causes of action."  The consent agreement prohibited all parties from making any disparaging statements "about adverse [p]arties to this case, their services, products, employees or abilities—whether verbally or in writing, including via online postings and websites, regardless of the truth or the falsity of such statements."

Between January 2018, when the consent order was filed, and August 2019, when the jury trial began, Hoffmann brought twelve successful motions for

---

[1] Jonathan Swift, *Political Lying, in 3 English Prose* (ed. Henry Craik 1916).
[2] Hoffmann Innovations, Inc. is a Georgia corporation.
[3] At times, we use "Hoffmann" to refer to the plaintiffs collectively.

sanctions against Clark.[4]  Hoffmann repeatedly asked the court to strike Clark's answer and counterclaims as a sanction, and the court gave that remedy after Hoffmann's fourth successful motion for sanctions.  For this reason, the jury trial in August 2019 was limited to the determination of whether Clark caused damages to Hoffmann and the amount of any damages.  The jury awarded Hoffmann and Hoffmann Innovations a total of $11,000,000 in damages, and the court awarded Hoffmann attorney fees.

Clark and RealTuners appeal.  They contend they should get a new trial because the sanction entered against them was too harsh, the district court wrongly prevented them from presenting evidence to limit the award of damages, the damages awarded by the jury were improper and excessive, and the court's award of common law attorney fees was in error.  Hoffmann and Hoffmann Innovations ask that we affirm.

**I. Background Facts and Proceedings.**

Hoffmann Innovations specializes in assisting customers, including racers, with do-it-yourself automotive tuning products and services for their automobile engines.  While Scott Clark was an employee of DIY AutoTune, his duties included creating curriculum and teaching training classes for customers, marketing and selling the classes, providing trackside support, and providing installation and tuning services.  The tuning products are very technical and complicated, and Clark is very knowledgeable about them.  Because of his expertise, many people listen to his advice about engine tuning through various forums, including his

---

[4] At times, we use "Clark" to refer to the defendants collectively.

personal Facebook page, where he had several thousand friends or followers, and public industry pages, some of which had more than 100,000 followers.

In July 2017, Hoffmann filed a lawsuit against Clark and the company Clark had started since leaving Hoffmann's employment, RealTuners, LLC. Hoffmann alleged Clark (1) defamed him and his company by publishing statements claiming Hoffmann was knowingly selling defective products out of greed (among others); (2) committed civil extortion, by threatening to make a "social media stink" and problems for Hoffmann if Clark was not paid a severance, which Clark then followed through on; (3) breached his employee duty of loyalty by using his access to confidential information and trade secrets to teach classes on tuning while he was still employed by DIY AutoTune without turning the money over to Hoffmann; (4) breached the two-year noncompete agreement he signed by opening RealTuners, which engaged in a substantially similar business to Hoffmann Innovations; (5) was unjustly enriched when he used Hoffmann Innovations' materials and equipment he failed to return to teach tuning classes after his termination from DIY AutoTune, while keeping the profit; (6) should be required to pay punitive damages; (7) and acted in bad faith by ignoring Hoffmann's demands he cease his misconduct. Hoffmann asked for an injunction to prevent Clark from operating RealTuners in violation of the noncompete agreement and posting derogatory comments about Hoffmann and his business.

Clark and RealTuners answered, asserting truth as an affirmative defense to the defamation claims. Additionally, they counterclaimed for defamation, injunctive relief, intentional interference with prospective business advantage, and invasion of privacy.

On January 22, 2018, the parties jointly asked the court to file a consent order, which stated in part:

> 1. The Plaintiffs in this case—Jerry Hoffmann and Hoffmann Innovations, Inc., d/b/a DIY AutoTune . . . contend that Defendant Scott Clark . . . has engaged in a pattern of oral and written defamation against Plaintiffs and are interfering with Plaintiffs' business relationships, prior to and after filing of the Complaint in this matter.
>
> 2. On the other hand, Clark contends that Hoffmann has engaged in oral and/or written defamation against Clark and are interfering with Defendants' business, prior to and subsequent to the filing of the Complaint in this case.
>
> 3. The Parties contend they have suffered and will continue to suffer damages as a result of such alleged misconduct.
>
> 4. In an effort to narrow the scope of litigation and avoid additional causes of action, to the extent possible, the Parties seek an order restricting all Parties from making any disparaging statements about adverse Parties to this case, their services, products, employees or abilities—whether verbally or in writing, including via online postings and websites, regardless of the truth or the falsity of such statements.
>
> 5. As such, the Parties are hereby ordered to refrain from making any disparaging or critical statements, express or implied, regardless of truth or falsity, in any form, written or oral (including but not limited to emails and online statements/postings), about an adverse Party to this case, to anyone (other than counsel and the Court). This applies to all statements about the Parties, including but not limited to about their businesses, owners and employees, their capabilities, their services, their reputation, their products, their methods of operation and business practices, their customers, their policies and/or business partners.
>
> 6. The Parties advised the Court they have not and will not make or file (or request/command another to file) any charge or complaint against an adverse Party to this case with anyone (other than those made prior to the initiation of this case regarding Clark's unemployment), including but not limited to any person, company, entity, law enforcement entity, organization, government agency, governing/regulatory body or investigative agency.
>
> 7. Furthermore, no Party to this case will, voluntarily or involuntarily, provide any individual a forum, including but not limited to a Facebook or other online page, to make any such disparaging or negative statements about an adverse Party in this case.
> . . . .
> 9. Within three (3) days of the date this Order is signed by the Court, the Parties will remove any negative statements or postings

or websites or videos they have made or published about an adverse Party to this case or which have been made or posted by anyone in a forum/post/website controlled by a Party. . . .

. . . .

12. . . . The Parties and attorneys are ordered to work in good faith prior to involving the Court in a dispute concerning the terms of this Order. Repeat violations of the terms of this Order should be brought to the Court's attention immediately.

13. Any violation of this Order may result in the imposition of sanctions and any offending Party may be forced to pay the reasonable attorneys' fees of any Party forced to bring a violation of this Order to the Court's attention.

The district court filed the order the next day.

With a focus on the consent order, Hoffmann filed his first motion for sanctions on March 5, 2018. He alleged Clark violated the consent order multiple times, including posting statements on Facebook that were negative about Hoffman's automotive engine management system.[5] Specifically, Clark said he "wouldn't run the latest MS3pro stuff, just an FYI on that. Problems." Then the day after the court filed the consent order, Clark took a question about the MS3 Pro product on his podcast, stating, "I only have about 36 more hours before I can't talk about these guys . . . due to a court order." Clark wrote other posts on Facebook, suggesting people should use products other than the MS3 Pro because it was difficult to use, had problems, and "tech support [was being]

---

[5] In the motion for sanctions, Hoffmann contended "Mega Squirt" or "MS" is his automotive engine management system, which permits the automobile to achieve peak performance, and that there are different versions of MS. Mega Squirt 3 Pro or "MS3 Pro" is the "high end" line of his MS products. In his resistance to the motion, Clark responded that there are multiple manufacturers of MS3; Hoffman is not the only manufacturer or owner of the trademark. He also argued that MS3 is not software owned by Hoffman; "[s]everal other companies not affiliated with Hoffman license this software." According to Hoffmann's trial testimony, while someone else "created the core product," he "sell[s] 100 percent of the original MegaSquirt products in the United States."

ordered to lie to you about the problem." Clark also suggested a user who stated they preferred the MS3 Pro had been paid to post the positive comment. For a remedy, Hoffmann asked the court to strike Clark's answer, require him to pay $10,000 into the court registry "to be forfeited and paid upon Clark's next violation of the order," and award Hoffmann attorney fees incurred in bringing the motion for sanctions.

Clark resisted the motion for sanctions, generally admitting he made the statements but denying he violated the consent order—sometimes challenging Hoffmann's understanding of the statement by emphasizing certain context and other times denying such a statement fell within the prohibitions of the consent order.

Following an unreported hearing on March 14,[6] the district court found Clark had violated the terms of the order, sustaining the motion for sanctions and requiring Clark to reimburse Hoffmann $3187.34 in attorney fees and travel expenses within thirty days. The court denied Hoffmann's request that Clark pay $10,000 to the court registry but said it would reconsider if future violations occurred.

Only two days later, Hoffmann filed a second motion for sanctions. Hoffmann alleged that Clark violated the consent order when he went on his podcast a few hours after the March 14 hearing and said, "It's been one of those fun days," before then singing, "Oh, justice for sale." Later during the podcast, one of Clark's cohosts stated, "If you write a check, you can have anything you want,"

---

[6] Clark did not attend the hearing, though Hoffmann and his counsel traveled from Georgia to attend.

in reference to a different issue. Clark then responded, "Oh, that's the theme today, isn't it, though?" before again singing "justice for sale."[7] Hoffmann asked for the same remedies, including striking Clark's answer and counterclaims, requiring Clark to pay $10,000 to the court registry, and ordering Clark to pay the attorney fees incurred in bringing the second motion. At this point, Clark's attorney was allowed to withdraw, and Clark filed a notice of his intent to represent himself in the proceedings. Clark resisted the second motion for sanctions, generally admitting making the statements outlined by Hoffmann but denying they violated the consent agreement.[8] Later, Hoffmann filed a motion for contempt, alleging that more than thirty days had passed and Clark had not yet paid Hoffmann $3187.34 to reimburse him for attorney fees and travel expenses for the first sanction.

The hearing on the second motion and contempt action took place on April 26. At it, Hoffmann played for the court portions of Clark's podcast and entered into evidence a document Clark admitted he authored and sent to his "group of hosts" for his podcast. It said:

> I'll be honest. I'm considering ending the podcast only because Hoffmann/DIYAutotune.com lawyers are manipulating my local court system with amazing prowess; at amazing cost I'm not allowed to talk about any of this, even here I am violating my "Gag Order"—but I'd like to point out that YOU GUYS ARE FREE TO TALK ABOUT IT OUTSIDE THE PODCAST OR ANY OF MY FORUMS

The court ruled from the bench, stating:

---

[7] At the hearing, the court asked Clark if he admitted it was him speaking when a recording of the podcast was played for the court and Clark agreed it was.

[8] Clark also filed a motion for sanctions, alleging Hoffmann was in violation of the consent order. This was heard at the same time as Hoffmann's motions. The court found Clark failed to resolve the alleged dispute prior to filing his motion for sanctions as required by the consent order and failed to prove Hoffmann willfully violated the consent order.

> This Court finds beyond a reasonable doubt that you're referring to my Order, you were referring to the judicial system, and you were referring to Plaintiff and his business. And . . . also I find you beyond a reasonable doubt are actively encouraging others to besmirch and badmouth and do whatever they can to cause distress to his business. I don't know how you put a value on that. You weren't here for the last hearing. An argument was made by [Hoffmann's counsel]—correct me if I'm wrong—one item that is sold might be $2,000, something like that. You can never prove something that didn't happen. How many items . . . were not sold or could not be sold? How many sales were thwarted because of those negative comments on your podcast? You're attempting to goad him, and you're getting it. Now you're attempting to goad the Court, and I will not tolerate that.

In its written order, the court sustained Hoffmann's second motion for sanctions and ordered Clark to deposit $10,000 into the court registry within thirty days. The money would be forfeited if Clark violated the consent order again. Additionally, Clark was ordered to pay Hoffmann's attorney fees of $3795 and travel costs of $1588.27, which were incurred for the second motion and hearing. Clark was also found in contempt for failing to pay $3187.34 from the March 14 order; he was given ten days to pay the sum to purge that contempt action.

On May 16, Hoffmann filed a third motion for sanctions and second application for contempt. He asserted Clark had yet to pay any amount toward the sums ordered on March 14 or April 26. Additionally, Hoffman alleged Clark again violated the consent order. Specifically, a nonparty, Zac, posted a picture of a cup with MS3 Pro's logo on Facebook. The photo was not directed at or involving Clark. But Clark then commented on the photo, "I cannot comment. The parties are in litigation." The comment thread continued, with Zac stating, "Beeter boom has an MS3, I know who I'd bet on if them two tangled lol." According to Hoffmann, "Beater Bomb" is a racecar equipped with MS3 Pro and is owned by one of

Hoffmann's customers. Clark responded, ". . . but couldn't make race last weekend because 'electrical issues'" (alteration in original). The back and forth continued, and then Clark posted, "Zac, it's ok. I still like you. You get worked up too easily, like I used to. You just need some shitty ecu[9] manufacturer to pay people to spread crazy stories about you, once that happens you'll learn to calm down." Zac seemed to understand Clark's post was about Hoffmann's company, as he responded in part, "That ecu manufacturer was the best thing since sliced bread when they were cutting you a paycheck." After several more comments, some about Clark losing his job with Hoffmann's company, Clark wrote again, "Oh, almost forgot. 'I cannot comment. The parties are in Litigation'—just making sure." Hoffmann asked the court to strike Clark's answer and counterclaim, fine him $500 for his contempt, jail him for "no less than 48 hours," and award Hoffmann attorney fees for bringing the third motion.

In July, Hoffmann moved to compel discovery.

On July 12, Hoffmann filed his fourth motion for sanctions and third application for contempt. Hoffmann, who lives in Georgia, said he recently learned Clark had filed in Iowa a petition for civil protection from Hoffmann. Clark's petition claimed he and his fiancée feared Hoffmann. However, Hoffmann had not been served, and Clark refused to provide the petition and exhibits to Hoffmann's attorney. Clark had filed the petition on April 25, the day before the hearing on the second motion for sanctions.

---

[9] Hoffmann explained "ecu" means engine control unit, which his company manufactures.

The court heard Hoffmann's third and fourth motions for sanctions on August 13. At the beginning of the hearing, the court informed the parties:

> I'm inclined at this point, if there are further findings and even based on the prior findings of contempt, Plaintiff has asked for me to strike your Answer and your Counterclaim. Another option that I'm getting kind of creative with—and the more I think about it the more I like it— is allowing plaintiffs to talk about it in front of the jury, and you don't get to respond. They get to talk about all the findings of contempt and what they were about because I think a lot of them have to do with the genesis of this case, and it kind of sheds more light on their case in chief.
>         . . . .
>         . . . I am persuaded to grant the request to strike your Answer and Counterclaim, but I want some authority. I want more authority than what I've been given so far. If I'm not persuaded I can do that, I'm certainly at a minimum going to allow them to tell a jury . . . exactly how many times he's been found in contempt, what he was ordered to do, and that it has not happened. And you are not going to be allowed to respond to that [Clark]. . . .

Clark responded he "would like to proceed today to be able to present my case. I don't believe that my contempt is willful." The court stopped Clark, pointing out he had already been found in contempt by the court twice and those rulings would not be reconsidered. The court continued:

> I'm not saying I've ruled on what's been alleged for today. But I've already found you in contempt twice, and I ordered you to pay $10,000 here, attorney's fees there, travel costs, knock it off, and those things didn't happen. I'm saying that I'm considering letting the Plaintiff bring that up to the jury, and you would not get to respond.

Hoffmann then presented as evidence printouts of the Facebook posts he outlined in his third motion for sanctions. When asked, Clark did not deny writing the comments and posting them; he argued it "looks to me as though employees or contractors, subcontractors of Mr. Hoffmann are baiting me." The court asked, "And are you taking the bait?" and Clark responded, "I have. I have compulsion. I've taken the bait multiple times. That's why I'm here."

Regarding the fourth motion for sanctions, Hoffmann noted the consent order provided that the parties would not file a charge or complaint against the other, which he asserted Clark violated by filing the petition for civil protection. Hoffmann also suggested Clark had fabricated evidence or intentionally misled the court in filing the petition for protection, noting one of the exhibits attached to the petition purported to be a message from Hoffmann to a nonparty, Timothy, sent in October 2017 and stating, "If [Clark's] not careful you're not going to have to worry about him being around much longer.  I'll shut him down.  I have a lot of ammunition, and I'm not kidding even a little bit."  When Hoffmann went through his own Facebook messages, he found he had sent a similar message—though to a different nonparty, Mark—and it actually said, "If he's not careful you're not going to have to worry about him being around much longer.  I will shut him down.  I have a lot of ammunition. *My lawyer is chomping at the bit*, and I'm not kidding even a little bit."  (Emphasis added.)  Clark maintained he submitted the exhibit exactly as he received it from Timothy, although a written submission included with the application, which took out "My lawyer is chomping at the bit" from Hoffmann's message, used ellipsis to show something had been removed—suggesting the writer was aware that a more complete version of the message existed.[10]  Raising additional questions about Clark's motive for filing the petition, Hoffmann pointed out the alleged basis was vandalism to Clark's fiancée's property that occurred in January, but Clark and his fiancée did not file the petition for protection until March,

---

[10] The written submission read, "If he's not careful you're not going to have to worry about him being around much longer.  I will shut him down.  I have a lot of ammunition *. . .* and I'm not kidding even a little bit."

were silent about it at the April hearing on sanctions, and never actually had Hoffmann served.

Clark argued that while he had not paid any money toward his sanctions, he "tried four separate times" to get Hoffmann to accept payments from him. He later seemed to change his statement, telling the court, "Long story short, as far as my willful contempt of court, I cannot afford sanction payments. I made that very clear. I provided financial documentation to their satisfaction that they requested. I turned it over happily. I offered to do the best that I possibly could." Clark argued "nonpayment of sanctions part is not because of willful or reckless behavior." The court asked him what sums he had paid toward the sanctions, and he responded, "Zero," again claiming Hoffmann would not take money from him. Hoffmann denied turning down money from Clark, and the court informed Clark the clerk of court was the receiver of the money. Clark responded, "My mistake is that I understood that I was to negotiate with [Hoffmann's attorney]."[11] The court seemed to believe this could have been a misunderstanding, but then Clark was unable to explain why he thought an order telling him to pay $10,000 to the court registry was also meant to be paid to Hoffmann.

During the same hearing, the court heard Hoffmann's motion to compel discovery. When asked under oath, Clark admitted he operated Facebook accounts under his name, his business name, and two aliases, though he had not provided any discovery response for the accounts of the aliases.

---

[11] At the same hearing, the court considered Clark's motion for sanctions, which, based on the content of the motion and with agreement from Clark at the hearing, was determined to be a motion to reconsider the court's previous contempt sanctions against Clark. The court overruled the motion.

The court ruled from the bench, concluding Hoffmann's third and fourth rule to show cause were proved beyond a reasonable doubt. The court was "persuaded to grant the request to strike [Clark's] answer and counterclaim" but asked for a brief with authority about sanctions available to the court.

In the court's August 31 order, it concluded Iowa Rule of Civil Procedure 1.517(2)(b)(3) permitted the court to strike the pleadings of a disobedient party and, because Clark willfully violated the consent order in bad faith, Clark's answer and counterclaim were stricken. Additional financial sanctions were denied. The court sustained Hoffmann's motion to compel discovery in part,[12] ordering Clark to provide within five business days his login and password for any and all Facebook accounts he posted under, a description of all classes Clark taught or put on (along with other information about the specific classes), all written communications between Clark and a California attorney that Hoffmann believed may be ghost-writing Clark's filings,[13] Clark's full judicial history, and Clark's petition for civil protection and the exhibits.

Hoffmann filed a fifth motion for sanctions and request for incarceration on November 20, 2018. He asserted Clark had violated the motion to compel, refusing to turn over his login credentials for Facebook or his communications with the California attorney. Clark had also not provided his full judicial history or all of the information relating to his classes. Hoffmann also alleged Clark had again violated the consent order by continuing to post disparaging comments about Hoffmann and his products on Facebook, including a comment that stated, "NO

---

[12] Clark also filed a motion to compel discovery, and it was sustained in part.
[13] Clark maintained he was pro se and was not receiving advice from any attorney.

'10% prices increases so we can spend more money suing little guys' behavior at RealTuners. We're read [sic] blooded Americans, not Nazis."[14]

The next day, the court filed a rule to show cause, ordering Clark to appear on November 29 with "all documents described and sought in plaintiffs' fifth motion for sanctions."

Hoffmann supplemented his fifth motion for sanctions on November 28, alleging that on November 22, Clark had changed his profile picture on Facebook to an image with the words, "STOP MEGASQUIRT LAWSUIT" and the website "REALTUNERS.COM/LEGALFUND." The website included the following:

> For the past 2 years RealTuners and their customers have been harassed, stalked, threatened, and ultimately sued by DIYAutotune.com for discussing faulty products and problems in public. We showed that they knew about problems and were dishonest about them. DIY has spent an estimated $300,000 in a civil lawsuit, after their attempts at a "criminal" case failed. You may have seen their website about us... it was quite interesting. NOW – we are at the point where their Attornies have convinced the court to demand I turn over financial information and contact names of all customers, and my personal facebook account, which they'll use to harass our customers and further damage our business. They also seek to shutdown RealTuners Radio. This is an industry-typical "War of Attrition" and a David vs. Goliath story.

It asked people to donate, share the story, and urge Hoffmann to stop the legal action against Clark and included the contact information of Hoffmann, some DIYAutotune employees, and some of Hoffmann's business partners. Additionally, on Facebook, some nonparties asked about the lawsuit, and Clark responded to some, including telling one person, "[O]ther parties all are involved in this because they are actively communicating with my customers in an effort to steer business

---

[14] On November 20, the case was assigned to a new judge, following Judge Christensen's appointment to the Iowa Supreme Court.

away from us. All of those businesses accept royalties from diy sales and all were aware of product problems but kept quiet in order to keep royalties flowing." Another nonparty posted, "One ploy may be to get everyone to send Registered Letters with signature required to DIY's legal counsel denying the use of our information. That would tie up their resources for awhile. Again, not a lawyer but I think there is a way." Clark then responded, "great advice as always" to the post and then, several minutes later, posted a link to the website of Hoffmann's attorneys. Clark then posted again, claiming, "This story is about big money trying to silence a whistle blower. Do you know what can happen when your fuel injectors locked upon a running engine? A couple people discovered the hard way and I'll be talking about that." Another nonparty commented, "Sharing it with everyone I can [Clark]." In other posts discussing the lawsuit, Clark said, "[J]udges are lawyers. Lawyers are a tight knit group." In response to one nonparty stating, in part, "Sometimes it's a sad corrupt world," Clark posted, "You NAILED it. They hired local lawyers who have lunch with all the judges here." At least one person responded to the line of posts, saying, "Wow, had no idea about any of this. Looks like I will never be doing business with diyautotune."

Clark came to the November 29 hearing without the discovery he was ordered to bring, and he told the court he would not turn over some of the Facebook information that was ordered. He claimed he was trying to hire an attorney to represent him but needed more time to find one. The court found Clark was in willful contempt of court orders but decided to wait to determine the punishment until Clark obtained a lawyer; he was given one week to find a lawyer and have them file an appearance in the matter. However, he was assessed the attorney

fees and traveling fees for Hoffmann, as he and his attorney had again traveled from Georgia for the hearing. Additionally, from the bench, the court ruled:

> [U]ntil the time that we have a hearing on the show cause, you may not go online and post anything, any comments about Mr. Hoffmann's business, not through your own identity, not through another person's identity. If there is a person related to you, you better ask them to do you a big favor and not post any negative comments about this. I will not have any further delays or any further increase in damages in this case. . . .
>
>     . . . .
>     Mr. Clark, you will further be refrained from referring to this litigation, referring to this Court, referring to anything related to this litigation.

On December 6, Hoffmann filed his sixth motion for sanctions. In it, he complained Clark continued to violate the court's orders by discussing the lawsuit. Clark, who had previously posted he may be jailed for his contempt before the November 28 hearing, responded to a question about how court went, stating he was "at [his] home, having a super good day, getting ready for class in FL this weekend." This led to others responding with their thoughts about the litigation. A few days later, Clark posted the image from the "get out of jail, free" card from the game Monopoly. He also continued to post about and sell clothing with the phrase "Free RealTuners" imposed on a jail cell. The website to buy the shirts included a description, stating, "FREE REALTUNERS—help us fight huge companies trying to shut us down because we speak truth."

The same day, Clark filed a document titled "Suggestion in Bankruptcy," in which he claimed he filed for protection under the bankruptcy laws on March 15, 2016, and "suggest[ed] that this action has been stayed by the operation of 11 U.S.C.A. § 362." Hoffmann filed a response, asserting Clark's action for

bankruptcy, filed before Hoffmann initiated his lawsuit, did not stay the proceedings.

Hoffmann filed his seventh motion for sanctions on December 17. In this motion, he maintained Clark violated the court's orders when he, on December 10, posted on Facebook:

> [A] quick update on the legal issues facing us: thanks to your support and donations #RealTuners was able to obtain legal advice that put the brakes on our aggressor's activity: one smart attorney amongst you, after reviewing all the 1000+ pages of paper thrown at us in the past 12 months - discovered a technical error on the part of DIY'S lawyers. As it turns out, you must pass tech to race on this surface!
>
> A simple note to the Court on OUR part effectively ends DIYAutotune's distracting and harassing legal activity against #RealTuners classes and our podcast. We filed it Thursday.
>
> Personally I'm sure DIY will still seek to drag this out, and via their facebook goons keep the crap going on social media (as if it ever stopped) because if you spent deep six figures only to lose on a minor technicality, so would you. Ylkes! That's A LOT of money poured straight down the drain! I wonder if they'll get their money back, and put it to better use??
>
> Also, at our hearing last week I was able to avert their request to incarcerate me for refusing to turn over all our electronic communications with all #RealTuners customers: thereby protecting both our intellectual property and theirs (yours!). I had prepared myself for this, just in case. Under no circumstances will I be releasing confidential information or intellectual property (your tune files!) to third parties without permission. Period. There may be some followup activity on our part to "quash" this request (yes, that is a legal term) but it'll be dead along with their lawsuit soon enough.
>
> Stay tuned as there are sure to be updates, but it looks like there is light at the end of the tunnel!

This post by Clark then generated a number of comments and posts from nonparties about Clark, Hoffmann, and their thoughts on the litigation.

In spite of his Facebook post saying he had been able to obtain legal advice, Clark appeared at the December 19 hearing pro se, reporting he had yet to find an attorney to represent him. As with all the other hearings, Clark did not deny writing

or posting the comments identified by Hoffmann; he just denied they violated any orders or claimed a lack of understanding of what was required of him. At the hearing, when the court was discussing what discovery Clark had yet to complete despite a court order to do so, Clark responded, "Facebook is not ever going to happen. I apologize. That's simply not going to happen, okay?" The court then confirmed, "Mr. Clark, on November 29th you were ordered to produce to the Plaintiffs' lawyers everything that was required by the court's August 31st hearing. . . . [B]ut for sure you're not turning over and you're refusing to turn over the Facebook information, is that correct?" Clark agreed, "That is correct, Your Honor." Ruling from the bench, the court again found Clark in contempt based on the actions alleged in both the sixth and seventh motions for sanctions; he was ordered to spend thirty days in jail and fined $500. In its written order, the court noted Clark had yet to pay any of the plaintiffs' attorney fees or travel costs since some were first ordered on March 14, had yet to pay any amount to the court registry since ordered on April 26, and continued to refuse to comply with discovery orders.

On January 23, an attorney filed an appearance for Clark. By consent of the parties, the jury trial, which had been scheduled to take place in February, was continued.

Before a March 20, 2019 hearing, Hoffmann filed an eighth, ninth, and tenth motion for sanctions. Each alleged further violations by Clark, by failing to turn over his Facebook account information and continuing to post disparaging comments about the lawsuit, Hoffmann, and Hoffmann's products on the internet. Clark's attorney attended the hearing in person, but Clark failed to do so in spite

of a court order requiring his presence. He participated by telephone, telling the court he did not attend in person because he did not want to be arrested and put in jail.[15] The court found Hoffmann in contempt for failing to appear at the hearing and for his recent social media posts. The court also found him in contempt for his continued refusal to turn over his Facebook history, noting that while Clark claimed it contained "privileged" information, this was a self-designation made by Clark, who had not proved any privilege existed or applied in this case.[16] The court entered a protective order months before, which prevented each party from disclosing or using the other's information, but this had not caused Clark to turn over the information he was ordered to provide. And while Clark had just recently complained about the size of the information he was ordered to give Hoffman, the court concluded he had not shown he was "*unable* to comply with the order . . . only that he is *unwilling* to do so." The court granted Hoffmann's eighth, ninth, and tenth motions for sanctions and ordered Clark to turn himself into the local jail on April 22 for a ten-day sentence for those contempts. The court also ordered Clark to serve three additional days for failing to personally appear at the hearing. Finally, the court ordered Clark to serve "an indefinite term . . . for the willful

---

[15] This statement must have been made before the court opened the record; it does not appear in the transcript, although Hoffmann's counsel alluded to such a statement being made and the court included it in its written ruling.

[16] At the same hearing, the court considered Clark's motion for adjudication of law points regarding Hoffmann's claim Clark breached the noncompete clause. The court denied the motion, ruling that because Clark's answer and counterclaims were stricken, Clark was "barred from obtaining any relief raised in defense of this lawsuit" and the "only issue remaining for trial is Plaintiffs' claim for damages against Defendants." The court also considered and denied Clark's motion for sanctions, in which he alleged Hoffmann had violated the court's previous order compelling Hoffmann to comply with discovery.

contempt of this court's orders requiring him to provide discovery, names his Facebook account information and history, to the Plaintiffs."  The term of incarceration was to end when Clark turned over the ordered information.

On April 25, Hoffmann filed his eleventh motion for sanctions.  Hoffmann alleged Clark was using the Facebook account of a nonparty, Mark, to continue posting comments about the litigation on social media.  Specifically, when a nonparty commented they did not understand how Clark could be ordered to produce his Facebook information since "[t]he law says you aren't required to give any information that could be self incriminating," Clark (using Mark's account) responded:

> EXACTLY (this is Scott posting).  That's why I am not turning it over.  The Judge was appointed to her position by Hoffmann's attorneys local to me (he has 4).  If you're into reading 3000+ pages, there are a number of 'errors of law' and 'errors of fact' being forced on me.  And I am refusing to be incarcerated illegally.  We could easily appeal this—if we had $50,000 to pay for it.

Clark did not turn himself in to serve his contempt sentences, and a bench warrant was issued for his arrest on April 26.  He was eventually arrested on May 16.

At a status hearing on May 17—scheduled before Clark was arrested—the court advised the parties that on May 3, court administration informed her that Clark had posted on Facebook that he was leaving Iowa to avoid his warrant and then also posted a link to the judge's personal Facebook page.  The court told Clark he was being found "in direct contempt . . . for posting those things" and it would be considered further in a later hearing—along with Hoffmann's eleventh motion for sanctions.  Clark stated he was now willing to turn over his Facebook

history, and the court made arrangements for Clark to have access to his computer while in jail in order to download the Facebook history from his personal account and any other accounts he had used or posted under.

On June 14, Hoffmann filed his twelfth motion for sanctions, which he later supplemented on June 27. In the original motion, Hoffmann outlined more social media posts where Clark spoke about the lawsuit and maligned the court, stating:

> 2 weeks on the road. Good news: class tomorrow in Kentucky!
> Crap news: can't go home to Iowa, because some shady judges, lawyers, and a hyper-wealthy stalker who believes Jesus told him to kill me, are winning. There actually exists a bench warrant for my arrest. . . . because I refused to forfeit my right not to give privileged information in a shady lawsuit trying to "shut me down in Jesus name"—I kid you not.
> If anyone is interested in a nice little home on 5 acres with lots of trees in southwest Iowa, hit me up. . . . 22 years there, I'm not paying anymore iowa property taxes after what we have seen taxpayer dollars fund in iowa courts, we aren't supporting that kind of racket anymore

(First ellipsis in original). As mentioned at the status hearing, Clark then posted a link to the presiding judge's personal Facebook page, stating, "Here's my judge. She's a social media starlet." When nonparties commented, suggesting fleeing the state due to an arrest warrant was not a good idea, Clark responded, "Don't let Jerry Hoffmann fool ya. he's the one with felony drug sales charges. Not me. I just stopped participating in a clearly biased and bogus lawsuit designed to distract you from the fact his products. . . still aren't fixed." (Ellipsis in original.) Clark also posted apparent threats toward Hoffmann's attorney, stating, "His lawyer told me on Weds 'We didn't intend for you to be pushed out of your house and home state.' My response: 'I didn't intend for you to have a compound fractured pelvis either[.]'"

At the June 27 hearing, Hoffmann complained that while Clark had turned over some of the ordered Facebook information, the information only went through August 2018 and, even then, did not include pictures or videos. Plus Clark provided Facebook information from only his personal page, not the aliases he used or the Facebook information for his friend Mark, whose account Clark admitted using to post. Clark, who again refused to appear in person, participated by telephone; his attorney was personally present at the hearing. Ruling from the bench, the court found Clark in contempt for posting the judge's personal Facebook page and for failing to personally appear. In a written order, the court also found Clark in contempt for the willful actions outlined in Hoffmann's eleventh, twelfth, and supplement to the twelfth motions for sanctions and for failing to turn over all Facebook information for all accounts he posted under. The court sentenced Clark to sixty days in jail and fined him $500 for each category of contempt ($2000 total). The court gave Clark the option to purge his jail sentence and fines if he appeared and participated in a mental-health evaluation with a specific doctor on a specific date. Additionally, the court ruled:

> This court is at a loss for how to move this case forward to a trial on Plaintiffs' damages, the only remaining issue in this case, without further hearings for contempt by the Defendant. This case is set for trial on August 20, 2019. Any further applications for contempt will be addressed in a pre-trial hearing or at trial in the context of damages. No further contempt hearings will be held before trial on August 20, 2019.

On July 9, Clark filed a "report to the court," in which he claimed he had two Facebook accounts "that are permanently locked" so he was unable to provide information from those accounts and that he had no "instant messages" available to give because he stopped using that feature two years earlier. He informed the

court his friend Mark, whose account he had used, "refuses to give the defendant his [F]acebook information."

Following an unreported hearing on July 17 "on Defendant's discovery responses and compliance status with previous court orders," the court filed an order noting that Clark had made conflicting statements about his use of Facebook Messenger. The court ordered Clark to "confirm the location of the Facebook messages within the archive previously provided or provide the messages in another format"; to "file an official notification from Facebook about the status of his locked accounts no later than 5 p.m. today"; and "identify his Facebook messages within his Facebook archive or otherwise produce his Facebook messages to the Plaintiffs by 5 p.m. today."[17]

On August 12, Hoffmann filed a document with what he contended were 100 "undisputed or stipulated facts" because Clark's answers and counterclaims were stricken. Hoffmann also filed a motion limine, asking the court to instruct Clark that, at trial, Clark was not allowed to comment on Clark's defenses, including but not limited to "any testimony about the quality of Hoffmann products or anyone else's opinion about Hoffmann products and dissimilarity between Parties' businesses"; Hoffmann's alleged conduct, including any allegation or claim of wrongdoing; any effect of litigation on Clark, such as having to move or a drop in business; statements about the parties' wealth or success; and the motion in limine and striking of Clark's pleadings. Clark responded to the motion in limine, agreeing the only issue remaining in the litigation was damages but arguing

---

[17] On July 19, Clark filed a motion asking the judge to recuse herself. Hoffmann resisted, and the court denied the motion in a written ruling on July 25.

Hoffmann was still required to prove damages were caused by Clark or RealTuners, LLC and in what amount, so "[d]efendants must be allowed to provide testimony or evidence that would challenge the amount of damages sought by the plaintiffs."

Clark filed a motion in limine the next day, asking the court to strike all of Hoffmann's trial exhibits[18] because he failed to file an exhibit list at least fourteen days before trial, as required by the trial scheduling and discovery plan filed on February 15, 2018.

Following an unreported pretrial conference, the court filed an order on August 16, granting Hoffmann's motion in limine entirely. The court denied Clark's motion in limine, ruling:

> While not filed 14-days in advance of trial as set out in the trial scheduling order, the Plaintiffs' exhibits list filed 8-days in advance of trial provides Defendant with a fair opportunity to prepare for trial and avoids unfair surprise to Defendants. Furthermore, any delay in Plaintiffs' filing has been caused in part by the Defendants' own failure to provide discovery to Plaintiffs, namely his Facebook history, for nearly a year. At the pretrial hearing, the court was informed that the Defendant has yet to comply with this court's most recent order to Defendant, Scott Clark, to identify his Facebook messages in his downloaded Facebook history, or to provide a new download of the Facebook history, including messages to the Plaintiffs by 5 p.m. on July 17, 2019. The Defendant has yet to comply with the court's July 17, 2019 order. The Defendants cannot show they have been disadvantaged, or surprised, by the late filing of the exhibit list when the Defendants have failed to comply with discovery rules and orders of this court concerning discovery of the Defendants' Facebook history. For these reasons, the Defendants' motion in limine concerning the late filing of the Plaintiffs' exhibit list is DENIED.
> IT IS FURTHER ORDERED THAT the Defendant, Scott Clark, provide a copy of the Defendants' Facebook messages in an *.html format, or other readable format, to the Plaintiffs no later than

---

[18] Clark also asked the court to strike Hoffmann's one witness that was not himself. This was also denied.

8 a.m. on Monday, August 19, 2019. Failure to comply with this order will result in further sanctions to the Defendants.

On August 19, Clark filed a motion asking the court to deny Hoffmann's request for attorney fees from "the court and/or the jury" because "[t]he noncompete clause does not mention attorney fees" and "no statute involved in this case that would allow the award of attorney fees." Hoffman responded, asserting attorney fees could be awarded in tort actions under common law "when a losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons."

Also on August 19, Hoffmann filed another application for rule to show cause, asserting Clark had still not provided his entire Facebook history, did not provide what was turned over in the format ordered by the court, had not proved he attended the mental-health evaluation, and continued to talk about the litigation on Facebook.

Before the jury trial began on August 20, Hoffmann advised the court that he had filed what he believed were stipulated facts, to which Clark had not objected, and thought it would be best if the court read those facts to the jury before his opening statement. Clark did not personally attend the first day of trial, but his attorney was present, and on Clark's behalf he "object[ed] to the Court reading facts and evidence into evidence." The court responded it was "open to how this gets presented to the jury" but "the jury does need to know that this case is kind of starting not at square one but we're starting a few steps ahead and all their responsibility is . . . to calculate damages in this case." Hoffmann suggested the stipulated facts might be included in the jury instructions, and the court responded

"that might work" before asking Clark how he thought the facts should be presented to the jury. Clark responded, "Okay. Well, I just want it noted that I object to you reading that to the jury or being it offered without foundation." After further discussion about what the facts should be referred to in front of the jury and how they might be presented in jury instructions, Clark stated, "So the record is clear, I object to your reading the stipulated facts to the jury." The court responded, "And I'm not [going to] call them stipulated facts. I'm [going to] call them facts deemed admitted, and I note your objection, and your objection will be overruled."

The jury trial lasted three days; Clark never appeared for it. Hoffmann and his wife were the sole witnesses. Hoffmann testified about Clark's actions from the time of his termination until trial started, including a number of negative posts Clark had written and the forums in which he shared those posts. Hoffmann also testified about the impact Clark's ongoing, negative statements about Hoffmann and Hoffmann Innovations had on his employees, their customers, and the resellers with whom he used to do business. Hoffmann's wife testified regarding how Clark's actions had affected Hoffman personally.

As part of the jury instructions, the jury was given a list of the 100 "facts deemed admitted" as well as the instructions on the relevant law. Clark's attorney "object[ed] to all facts deed admitted," stating, "I don't think it was proper for the Court to have sanctioned my client by striking all of his pleads."

On the first page of the special verdict for given to the jury, it was told:

> With the exception of damages, the Court has determined that Plaintiffs have proven all the propositions regarding the instructions on: spoliation of evidence; breach of fiduciary duty; breach of contract; civil extortion; and, libel (slander) per se.

Your duty is to determine whether Plaintiffs have proven damages and, if so, the amount.

The jury returned a verdict for Hoffmann and Hoffmann Innovations in the amount of $11,000,000, with $4,939,750 against Clark and $6,060,250 against RealTuners. Specifically, the jury awarded:

| Amount | Awarded to | Awarded against | Legal claim |
|---|---|---|---|
| $500,000 | Hoffman | Clark | libel per se |
| $500,000 | Hoffman | RealTuners | libel per se |
| $2,060,250 | Hoffmann Innovations | Clark | libel per se |
| $2,060,250 | Hoffmann Innovations | RealTuners | libel per se |
| $27,000 | Hoffmann Innovations | Clark | breach of fiduciary duty |
| $102,500 | Hoffmann Innovations | Clark | breach of contract |
| $250,000 | Hoffmann Innovations | Clark | civil extortion |
| $2,000,000 | Plaintiffs | Clark | punitive damages |
| $3,500,000 | Plaintiffs | RealTuners | punitive damages |

Clark and RealTuners filed a motion for judgment notwithstanding verdict (JNOV) on September 3, alleging Hoffmann "provided no evidence of damages other than the unsupported claims by plaintiff Jerry Hoffmann" so the court should have sustained his motions for directed verdict. He also filed a motion for new trial and request for remittitur, arguing the damages testified to at trial were not supported by substantial evidence, but even if they were, those damages were for $4,500,000 for Hoffmann Innovations and $1,000,000 for Hoffmann—substantially less than the $11,000,000 awarded. Clark also claimed "the jury should not have been given instructions concerning the bad acts of the defendants since [the court sustained Hoffmann's motions for directed verdict and] that was no longer an issue at trial . . . ." and challenged the court's decision to allow Hoffmann to introduce exhibits and the testimony of Hoffmann's wife when Hoffmann's exhibit and

witness list were not provided fourteen days before trial. Hoffmann resisted both of Clark's motions.

On October 1, the court heard Clark's post-trial motions, as well as issues that remained following the trial, including Hoffmann's request for attorney fees; an injunction; and another motion for rule to show cause filed by Hoffmann on the eve of trial, which he also supplemented after trial. Clark again failed to personally appear in spite of being ordered to do so; he participated by telephone.

Clark maintains his motions should be granted, reiterating that Hoffmann's testimony alone was not sufficient to support the jury's award—not the $5,500,000 he asked for or the amount awarded by the jury. He also challenged the jury's award of punitive damages, arguing the amount was too much considering the jury had little evidence of Clark's net worth. Clark asserted the jury based its award on being "upset Mr. Clark did not appear at trial, they just felt sorry for Hoffman and his wife." Regarding Hoffmann's motions, when discussing the request for attorney fees, Hoffmann's attorney stated he had subtracted the amounts previously awarded by the court from the amount of requested fees, affirming "these are things that have not already been awarded." Like his written response to the request for fees, Clark argued attorney fees are only allowed under statute or contract; for the first time, he also argued if Hoffmann was relying on equitable principles for the fees, he could only be awarded fees incurred to get the equitable relief—the injunction—and not the monetary damages. Hoffmann also argued in favor of extinguishing the consent order but enjoining Clark from making other false statements about him and his products.

In its later written ruling, the court denied Clark's motion for JNOV and new trial. It granted Hoffmann's request for an injunction, and enjoined Clark and RealTuners from

> speaking, posting or otherwise publishing false, deceptive or disparaging comments about the Plaintiffs and are specifically enjoined from making the following admittedly false statements about Hoffmann or Hoffmann Innovations:
>     1. That Hoffmann or Hoffmann Innovations knowingly or otherwise sold/sells defective products and/or products that they could not/cannot support;
>     2. That Hoffmann or Hoffmann Innovations sold defective products out of greed;
>     3. That Hoffmann or Hoffmann Innovations is dishonest in business dealings;
>     4. That Hoffmann or Hoffmann Innovations has sold/sells dangerous or fire prone or explosion-prone products;
>     5. That Hoffmann or Hoffmann Innovations published false failure rates associated with their products/services;
>     6. That Hoffmann or Hoffmann Innovations published false information relating to damages caused by their products; and/or
>     7. That Hoffmann or Hoffmann Innovations published untrue things about Clark relating to his income, reputation and whether he destroyed engines.

Additionally, the court granted Hoffmann's request for attorney fees, finding

> the Defendants doggedly and relentlessly published false, disparaging and damaging information about Plaintiffs in multiple mediums and multiple forums. The court attempted to quell the damage by sanctioning the Defendants and by prohibiting the parties from posting or publishing disparaging comments about each other in January 2018, however the Defendants ignored the court's orders entirely and repeatedly. When the court prohibited the Defendants from posting or making comments about this litigation in any respect in an effort to reduce the number of contempt applications filed with the court, the Defendants began posting disparaging comments about the court and the legal system in general, including requesting donations to a legal defense fund. . . .
>         . . . .
>     Furthermore, the Defendants blatant disregard for the legal process and the court's orders resulted in numerous contempt hearings in this matter. The Defendants' defiant conduct delayed litigation, wasted court resources, and drove up the expenses in this case, including the Plaintiffs' attorneys' fees.

The court ordered Clark and RealTuners to pay $210,743.21 of Hoffmann and Hoffmann Innovations' attorney fees.[19]

Clark and RealTuners appeal.

## II. Discussion.

### A. New Trial: Improper Striking of Answer and Counterclaims.

Clark and RealTuners maintain they are entitled to a new trial because the district court improperly struck their answer and counterclaims as a sanction for Clark's repeated willful violations of the consent order and other court orders. "We review a district court's order imposing sanctions under our rules of civil procedure for an abuse of discretion." *First Am. Bank v. Fobian Farms, Inc.*, 906 N.W.2d 736, 744 (Iowa 2018) (citation omitted).

To start, we have to determine the appropriate scope of our review. Clark advocates our review of whether the court was right to strike the answer and counterclaims is limited to his actions at the time the court ordered the sanction—after Hoffmann's fourth successful motion for sanctions. But Hoffmann suggests that we should consider Clark's actions through all twelve successful motion for sanctions.

Clark cites *Kendall/Hunt Public Co. v. Rowe*, 424 N.W.2d 235, 240 (Iowa 1988) for the proposition that the court is to consider the record as it existed at the time the sanction was entered in determining whether the sanction was appropriate. In *Kendall*, the district court entered a default judgment against the

---

[19] Based on the affidavit filed after trial by Hoffmann's attorney, Hoffmann asked the court to award $211,787 in attorney fees. It is not clear from the court's ruling why it reduced the requested award by approximately $1000.

defendants in September 1984 after they failed to comply with the court's discovery order. 424 N.W.2d at 238. Then, about a month later, the defendants' attorney filed a motion to set the default judgment aside, which the court ultimately granted, determining the default never should have been entered as a sanction in the first place because the failure to comply with discovery was not due to willfulness, fault, or bad faith. *Id.* at 239–41. After the defendants were successful at trial, the plaintiff appealed the district court's decision to set aside the default. *Id.* at 237. In considering whether the district court was right to set aside the default judgment, we recognize our supreme court said it was "turn[ing] to the record in this case as it existed on September 5 when the default was entered." *Id.* at 240. But we do not think this stands for the proposition that sanction decisions should always be reviewed as the record stood at the time when they were entered. Ultimately, the court upheld the district court's decision to reconsider the earlier sanction and set aside the default judgment and, in doing so, reiterated, "A trial judge may usually correct his or her own ruling or that of another judge of the same court anytime before a final judgment." *Id.*

Here, given Clark's continuing pattern of behavior throughout this case, we believe we should consider all of Clark's willful violations—even those that took place after the court ordered his answer and counterclaims to be struck—to determine if the sanction is appropriate. We reach this conclusion because, while the pleadings were struck relatively early in the pendency of the case, the enforcement or consequences of that sanction did not take place until the jury trial and the court could have reconsidered its sanction decision anytime up to the trial. And, Clark can hardly complain where his own behavior throughout this case

supports what the district court foresaw, he would not be deterred from violating the court's orders. We think it could lead to an absurd result if we consider just Clark's actions leading up to the fourth willful violation; if his actions up to the fourth sanction did not warrant striking his pleadings but his actions up to time of trial did, why should Clark get the benefit of a new trial? Even so, we find the sanction was warranted when it was issued.

The district court relied on Iowa Rule of Civil Procedure 1.602(5) to strike Clark's pleadings. Rule 1.602(5) provides that "[i]f a party or party's attorney fails to obey a scheduling or pretrial order, . . . the court, upon motion or the court's own initiative, may make such orders with regard thereto as are just, and among others any of the orders provided in rule 1.517(2)(b)(2)-(4)." Rule 1.517(2)(b)(3) explicitly gives the court the right to enter an order "striking out pleadings or parts thereof, . . . or rendering a judgment of default against the disobedient party."

On appeal, Clark is not disputing the district court had the authority to strike his pleadings. He claims the sanction was too harsh or unreasonable in light of his actions and their effect on the litigation. He contends the court's decision to strike his pleadings and then deem all of Hoffman's allegations as admitted facts was tantamount to entering a default judgment against him for each of Hoffmann's claims, and Clark reiterates that "[b]ecause the sanctions of dismissal and default judgment preclude a trial on the merits, the range of the trial court's discretion to impose such sanctions is narrow." *Troendle v. Hanson*, 570 N.W.2d 753, 755 (Iowa 1997). The district court did not enter default judgment in favor of Hoffmann; he was still required to prove to the jury that he suffered damages as a result of each of Clark's complained-of actions and the amount of damages suffered.

However, we recognize the sanction imposed greatly circumscribed the issues to be determined by the jury, and the district court's discretion "narrows" when the sanctions are more drastic. *See Kendall*, 424 N.W.2d at 240.

Clark urges us to evaluate his claim by considering factors used by at least some federal courts when deciding whether to impose a more extreme sanction, such as dismissal. *See id.* at 242 (noting Iowa Rule of Civil Procedure 134, now renumbered rule 1.517, mirrors Federal Rule of Civil Procedure 37 and cases under rule 37 are persuasive authority); *R.E. Morris Invs., Inc. v. Lind*, 304 N.W.2d 189, 191 (Iowa 1981) ("[W[e note that the federal courts have recognized constitutional limitations on the imposition of sanctions pursuant to [rule] 37 . . . and decisions in the federal courts interpreting that rule are of persuasive authority."). We accept Clark's invitation and review his actions[20] while considering the following factors:

> (1) the degree of actual prejudice to the [non-violating party]; (2) the amount of interference with the judicial process; . . . (3) the culpability of the litigant; (4) whether the court warned the party in advance that dismissal of the action would be a likely sanction for noncompliance; and (5) the efficacy of lesser sanctions.

*Ehrenhaus v. Reynolds*, 965 F.2d 916, 921 (10th Cir. 1992) (alteration in original) (citation omitted).

---

[20] When reviewing the district court's imposition of sanctions, "[w]e must . . . be satisfied that substantial evidence supports any factual findings necessary to the court's exercise of its discretion." *Troendle*, 570 N.W.2d at 755. Clark has not challenged any of the factual findings against him (although he challenges some of the context surrounding his posts, arguing they were just "ambiguously negative"). But, even if he did, our review of the record convinces us the fact findings against Clark following each motion for sanctions are supported by substantial evidence.

Because Clark has limited his review of his actions to the first four sanction hearings, he maintains Hoffmann and Hoffmann Innovations "did not suffer any actual prejudice" because his early behavior "had [nothing] to do with any claimed discovery violation or impeding [their] ability to prosecute their case." We disagree. In this case, which began with each party asserting the other was harming their business by dishonestly disparaging them and their products in public, the ability to determine the amount of damage caused to them and their respective businesses was always going to be difficult. It was hard to ascertain how many people saw or heard the defamatory comments and what impact it had on their purchasing decisions. For this reason, and "in an effort to narrow the scope of litigation and avoid additional causes of action, to the extent possible," the parties agreed to enter the consent order.

Even considering just Clark's early actions, he continued posting in places where anywhere from 4000 to over 100,000 people could see it, alleging Hoffmann's products were difficult to use, had problems, and that Hoffmann's customer service representatives were being paid to lie to people about these issues. Additionally, Clark explicitly encouraged his podcast cohosts to use their platform to do the same. These actions had the potential to cause further harm or damages to Hoffmann's business and reputation and impeded Hoffmann's ability to prosecute his case as it was pled. Of course, the actual prejudice is even worse when considering Clark's later actions of repeatedly informing the court he understood what he was required to turn over regarding Facebook history (his and several other accounts he admitted using) but also that it was "not ever going to happen." At the time of trial, Clark had still not turned over all of the discovery

required of him, in spite of the fact that it was ordered more than a year before the trial began.

Clark's amount of interference with the judicial process was great. He knowingly and purposely violated the consent order a number of times, he mocked the court and the ongoing litigation in the public, he refused to turn over discovery he was repeatedly ordered to produce, and, by the end, he stopped attending all hearings and even skipped trial—apparently because he did not want to serve the jail time he was ordered to serve for his repeated violations. Clark even posted that he had "decided to stop participating and start making fun of them again." As he made clear to his followers, Clark refused to recognize the power of the court and did as he wished throughout the proceedings.

Clark's culpability is also great. While it is possible some of his earliest actions were due to a lack of understanding about the confines of the consent order he agreed to, leading up to the trial, Clark made clear that he understood what was expected of him and just chose not to comply. For example, Clark's posts made it clear he knew he was supposed to turn himself in to serve a jail sentence for one of his contempts, but instead he chose to go on the run. As we noted before, Clark understood what he was expected to turn over regarding Facebook information in response to the court's discovery order and just blatantly told the court it was "not ever going to happen." Clark was repeatedly ordered to attend contempt hearings in person, and he repeatedly participated by telephone so he could not be jailed for his actions, telling the court as much from the phone.

Clark maintains he was not warned his pleadings may be struck as a sanction for his continued violations before the court imposed the sanction. It

appears this is technically true; we have found no statement from the court directly to Clark warning him the court may choose to strike his answer and counterclaims as a sanction before the court did so. But the consent order, which Clark agreed to with the assistance of counsel, warns that "[a]ny violation of this Order may result in the imposition of sanctions." And Hoffmann asked the court to impose the sanction of striking Clark's pleadings in his first three motions for sanctions. Similarly, Hoffmann similarly spoke about the possible remedy at the first two sanction hearings.[21] So Clark was at least aware that Hoffmann believed it was an appropriate sanction and that the court was being asked to consider it.

Clark maintains "there were many less drastic, alternative options available to the court than striking the pleadings" and then recognizes, "Indeed, the district court implemented many of them against Clark throughout the proceedings." What strikes us about this statement is that, looking at all of Clark's actions and behavior through the start of trial, none of the sanctions had the desired effect. Clark suggests a lesser sanction could have done the job, but they did not. He never paid any amount into the court registry, his fines, or Hoffmann's attorney fees he was ordered to pay; he failed to serve his later jail sentences, reporting he was on the run and not returning to the state, and he refused to turn over the discovery that was ordered or even attend trial. Nothing slowed or stopped his behavior even before the pleadings were struck. And through it all, he continued to post damaging comments about Hoffmann, his products, and his businesses to

---

[21] Hoffmann also spoke about the remedy at the third hearing, which was a combined hearing on his third and fourth motions for sanction, but as that hearing followed Clark's actions that ultimately led to the sanction, any such discussion of the remedy would not be a warning to Clark.

potentially large numbers of people. Worse, Clark used his contempt for the court process to incite his social media followers against Hoffmann. Neither the "lesser" sanctions nor the "drastic" sanction caused Clark to comply with court orders such as turning over discovery or ceasing actions that were causing new, further damages to Hoffmann and his business after the lawsuit was initiated. Alternatively, Clark argues the court could have remedied Clark's continued violations "by allowing Hoffmann and [Hoffmann Innovations] to amend their petition to include each new violation as another basis for their defamation claim." But this remedy was never suggested to or asked of the district court, so we will not now consider whether it would have been a more appropriate sanction. *See State v. Rutledge*, 600 N.W.2d 324, 325 (Iowa 1999) ("Nothing is more basic in the law of appeal and error than the axiom that a party cannot sing a song to us that was not first sung in trial court.").

Clark also suggests that we should consider he was pro se litigant for much of the time leading up to trial, claiming he "lacked a fundamental understanding . . . of what the consent order's language actually meant." *See Lindstedt v. City of Granby*, 238 F.3d 933, 937 (8th Cir. 2000) (considering that litigant was pro se when determining if sanction was appropriate, but also noting, "A pro se litigant is bound by the litigation rules as is a lawyer"). We recognize that Clark was represented by counsel from the time the consent order was entered until March 19, 2018, at which point Hoffmann had just filed his second motion for sanctions. Another attorney did not file an appearance for Clark until January 23, 2019, at which point the court had recently sustained Hoffmann's seventh motion for sanctions and rule to show cause. Clark was then represented from the eighth

motion for sanctions through his post-trial motions. While Clark had no attorney of record for about ten months during the pendency of the case, most of his violations during this time showed he understood what was required of him and he chose to violate those requirements. In his online posts, he repeatedly referenced that he was not supposed to speak about Hoffman or the ongoing litigation but made a joke out of it. His explicit statement to the court that he would never turn over the ordered discovery happened during this same time. And we note that there is reason to believe Clark was receiving legal advice from an attorney or attorneys even while he had no attorney of record. Hoffmann raised questions about whether Clark was receiving advice from a California attorney early in the proceedings, which Clark denied, but the district court questioned Clark's credibility on the matter. Additionally, Clark's own posts during the time he claimed to be unrepresented reference that he received legal advice. On December 10, 2018 he posted, in part:

> [T]hanks to your support and donations #RealTuners was able to obtain legal advice that put the brakes on our aggressor's activity: one smart attorney amongst you, after reviewing all the 1000+ pages of paper thrown at us in the past 12 months—discovered a technical error . . . .

Even assuming Clark was a truly pro se litigant for much of the case, this does not convince us that striking his pleadings was too drastic or harsh a sanction.

As our case law suggests, the sanction imposed should be proportionate to the effect the violating party's action had on the proceedings and the other party. *See In re Marriage of Williams*, 595 N.W.2d 126, 129–30 (Iowa 1999) (confirming entry of default judgment against violating party, where violating party failed to comply with discovery requests, even after given two additional deadlines, and the

failure to comply prejudiced the other party); *Fenton v. Webb*, 705 N.W.2d 323, 326 (Iowa Ct. App. 2005) (affirming district court's decision to strike violating party's answer and finding party in default when the party was willfully noncompliant of discovery orders and failed to personally appear when ordered); *Cf. In re Det. of Huss*, 688 N.W.2d 58, 65 (Iowa 2004) (considering whether "drastic" sanction of entering default judgment may have been necessary to stop noncomplying party from blocking the other party's ability to prove their case). Here, we find the sanction does just that.

Finally, within the same section of his appellate brief, Clark challenges a corollary decision of the district court. Shortly before trial, Hoffmann filed 100 "facts" which he suggested were undisputed since Clark's answer and counterclaims had been struck. Clark did not resist. The court ultimately determined they were "facts deemed admitted," read them to the jury at the beginning of trial, and then included them in the written jury instructions. Now on appeal, Clark seems to raise three separate issues. First, he challenges that the court made the decision to deem the facts admitted, claiming that because the court was wrong to strike his pleadings, it follows the remedy of "deemed admitted facts" were also in error. Second, Clark argues that even if it was appropriate for the court to deem the facts admitted, the court should not have included them in the written jury instructions. And third, Clark picks twelve of the one hundred facts that he claims were "irrelevant" and "[i]nstructing the jury of these was in error."

We understand Clark's first argument to be a natural extension of his claim the sanctions were inappropriate, and we consider it under that umbrella. But his second and third argument were not preserved for our review. Before the jury was

brought in on the first day of trial, Hoffmann asked the court to read the facts to the jury, and Clark's response was that he "would object to the Court reading facts." When the court expressed it was open to other suggestions how the jury should be informed of the facts, including that they be added to the jury instructions, Clark again stated, "I just want it noted that I object to you reading that to the jury." A couple days later, when the parties and the court were specifically discussing jury instructions, Clark stated, "I object to all facts deemed admitted. I don't think it was proper for the Court to have sanctioned my client by striking all of his pleadings." But this seems to be an objection in line with Clark's first argument—because the pleadings should not have been struck, the facts should not have been deemed admitted. It is not an objection to the form the facts were being presented to the jury, i.e. giving them a written list of the facts deemed admitted. Rather, it is an objection that the court ever deemed them admitted in the first place. Clark never took issue with any specific fact out of the 100 before they were given to the jury, let alone the twelve he now lists as "most problematic." Therefore, we do not consider his second and third arguments related to the facts deemed admitted. *See Meier v. Senecaut*, 641 N.W.2d 532, 5374 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal."). Yet, even if we did consider the arguments, the 100 "facts" arose from allegations made in the pleading and all of Clark's defenses to those facts were struck.

Considering all the foregoing, the district court did not abuse its discretion in imposing the sanction of striking Clark's answer and counterclaims. For the same reason, it was not an error to instruct the jury on the "facts deemed admitted."

**B. Limitation of Clark's Evidence.**

Leading up to trial, Hoffmann filed a motion in limine, asking the court to prevent Clark and RealTuners from "offering any defense to their behavior as alleged in the Complaint or any justification for same," including but not limited to

> testimony about the quality of Hoffmann products or anyone else's opinion about Hoffmann products and any dissimilarity between the Parties' businesses. Permitting Defendants to offer a defense or justifications for their actions permits irrelevant testimony and prejudices Hoffmann and it rewards Clark for his misbehavior leading to the striking of his Answer/Counterclaims.

Additionally, Hoffmann asked the court to prevent Clark from "discuss[ing] any allegation or claim of wrongdoing by Hoffmann—at any time." The court granted Hoffmann's motion in limine in its entirety.

On appeal, Clark challenges some of the court's evidentiary rulings, arguing the district court abused its discretion when it agreed with Hoffmann's objection the answers were no longer relevant since Clark was not allowed to present any defense for his actions, such as truth in response to the defamation claim. Clark maintains the testimony he was attempting to elicit was admissible because it was relevant to show some of the damages Hoffmann claimed were not due to Clark.

Clark challenges the following specific court rulings, which occurred while Hoffmann was being cross-examined at trial:

> DEFENSE COUNSEL: Did you ever write an e-mail to the public or on your Facebook saying—regarding your MS3Pro that we had an issue, we acknowledged it and we are making it right?
> HOFFMANN: I think—
> PLAINTIFF'S COUNSEL: Your Honor, I object. This was covered in a motion and the ruling filed prior to trial on—
> THE COURT: I agree. I'm going to sustain the objection and ask that you move on from that question, [defense counsel].
> PLAINTIFF'S COUNSEL: Your Honor, I would also respectfully ask for an instruction that the instructions set forth in the

Court's order prior to trial be followed because this is prejudicially asking the questions that are improper. We've been instructed on what to do.

THE COURT: Understood. Understood.

DEFENSE COUNSEL: Well, did your MS3 product ever fail?

PLAINTIFF'S COUNSEL: Same objection, Your Honor.

DEFENSE COUNSEL: Your Honor, the crux of this case is whether or not my client lied about his product, and I'm not even allowed to ask about it.

PLAINTIFF'S COUNSEL: Not anymore it's not, Your Honor. That ship has sailed.

THE COURT: Gentlemen, I understand what you're saying, and we addressed this in our pretrial motions, and so you're aware of the ruling in that matter, and so we need to move on from that line of questioning.

A short while later, the following exchange took place:

DEFENSE COUNSEL: Have you ever acknowledged anywhere at any time that your MS3Pro or your MS3Pro Ultimate had problems?

PLAINTIFF'S COUNSEL: Same objection, Your Honor, and I've asked for an instruction to stop going down this road because it's prejudicing the jury. The Court ruled on this issue already.

THE COURT: Go ahead.

DEFENSE COUNSEL: It's prejudicial to my client not to be able to defend himself.

THE COURT: Well, your client could choose to come and be present and defend himself, [defense counsel,] so we've had a prior court ruling on this issue, and you need to move on from this topic. The objection is sustained.

Later, after Clark called Hoffmann to testify, the following occurred:

DEFENSE COUNSEL: Did you ever start a Facebook attack or strike back in any way at Mr. Clark?

PLAINTIFF'S COUNSEL: Objection, Your Honor. That question is directly implicated by the Court's instructions prior to trial.

DEFENSE COUNSEL: I'm not sure about that.

. . . .

THE COURT: . . .That objection is sustained, and . . . you need to move on to a different line of questioning for Mr. Hoffmann.

DEFENSE COUNSEL: My client tells me that you've been convicted of a felony; is that true?

PLAINTIFF'S COUNSEL: Same objection, Your Honor.

THE COURT: I'll sustain the objection.

"We review relevance rulings for an abuse of discretion." *State v. Tipton*, 897 N.W.2d 653, 691 (Iowa 2017). But "[e]ven if we find an abuse of discretion, we will not reverse the ruling unless it caused prejudice." *State v. Buenaventura*, 660 N.W.2d 38, 50 (Iowa 2003).

As we understand all of the court's rulings up through trial—following all the rulings on sanctions and even after granting Hoffmann's motion in limine—Hoffmann was still required to prove that he suffered damages as a result of Clark's complained-of actions and the amount of those damages. That understanding is supported by the special verdict form given to the jury, which stated, "Your duty is to determine whether Plaintiffs have proven damages and, if so, the amount." Because the jury was required to determine the amount of damages actually caused by Clark's actions, evidence regarding whether Hoffmann or his company's reputation was suffering due to other reasons—such as real issues with products—would be relevant for the determination of damages. So the court should have admitted such evidence and instructed the jury as to the limited purpose it could consider it.

That being said, we cannot say Clark was prejudiced by the court's rulings excluding the evidence. Clark asserts on appeal that "[e]ach of these sustained objections had a great and significant impact on [his] ability to defend this action." But Clark did not make an offer of proof to show how Hoffmann would have answered any of the questions he was posed, so we do not know what the excluded testimony would have been or what it would have added. *See Deters v. Int'l Union*, *Security, Police & Fire Prof.*, No. 20-0262, 2020 WL 6157816, at *4 (Iowa Ct. App. Oct. 21, 2020) (affirming the district court's decision to exclude

testimony as being irrelevant, where the complaining party "did not make an offer of proof to show what the excluded testimony would have added" and "even if the district court [was] wrong[], the record does not show the [complaining party] was prejudiced"). Clark wants us to assume Hoffmann would have answered that he knew the MS3 Pro had failed and he had told his customers as much, but he points to nothing in the record that supports that assumption. To that end, when Clark did inquire about the Hoffmann products, Hoffmann confirmed the products did not start a fire and no customer alleged that they had.

Clark has not shown he should receive a new trial because he was prejudiced by the court's exclusion of relevant evidence.

### C. Amount of Jury Award.

Clark challenges each of the jury's award of damage—except the damages for breach of fiduciary duty and breach of contract—arguing he is entitled to a new trial "or at least a remittitur" because the damages are flagrantly excessive. Hoffman represented throughout the case that the damage Clark was causing was "difficult to quantify." On its face, this jury award is extremely large, so we look carefully at the categories of damage and the evidence supporting the jury's numbers.

At the start, when reviewing a claim that damages were excessive, "we view the evidence in the light most favorable to the verdict and need only consider the evidence favorable to the plaintiff whether contradicted or not." *Rees v. O'Malley*, 461 N.W.2d 833, 839 (Iowa 1990) (citation omitted). "The assessment of damages is traditionally a jury function. Its decision should be disturbed only for the most compelling reasons." *Id.* (citation omitted). We will only reduce or set aside a jury

award if it is "(1) is flagrantly excessive or inadequate; or (2) is so out of reason as to shock the conscience or sense of justice; or (3) raises a presumption it is a result of passion, prejudice or other ulterior motive; or (4) is lacking in evidentiary support." *Id.* (citation omitted).

**Civil extortion.** The jury awarded Hoffmann Innovations $250,000 for its civil-extortion claim against Scott. This claim was based on Scott's statement to Hoffmann that he would make a "social media stink" if Hoffmann Innovations did not pay him a severance. In a taped phone call of when Clark was terminated, the recording captures Clark confirming he would "go away" if he could get a severance payment. He insinuated that there might be a "public mayhem" if he were to get "pissed off." The payment would come with his "promise" he would not blow up, followed by another promise to "get off social media." On appeal, Clark argues Hoffmann "presented no evidence to support an award of damages for the claim of civil extortion." We disagree.

The jury was instructed the elements of extortion included

> 1. A person commits extortion if the person does any of the following with the purpose of obtaining for oneself or another anything of value, tangible or intangible, including labor or services:
> a. Threatens to inflict physical injury on some person, or to commit any public offense;
> b. Threatens to accuse another of a public offense;
> c. Threatens to expose any person to hatred, contempt, or ridicule;
> d. Threatens to harm the credit of a business or professional reputation of any person; or
> e. Threatens to wrongfully injure the property of another.

Clark's only challenge to the jury instruction was, "I don't believe there's a prima facie case of extortion." Clark did not object to the form of the instruction, therefore, it becomes the law of the case. *See Kiner v. Reliance Ins. Co.*, 463 N.W.2d 9, 14

(Iowa 1990). So with this instruction in mind, a jury could find Clark threatened "to expose [Hoffman] to hatred, contempt, or ridicule" and "to harm the credit of a business or professional reputation of [Hoffman and his business]." As other support of this message of threats, Clark also contacted Hoffman's business associate directing him to convince Hoffman to drop the civil case or Clark would attempt to stop the sale of the products that both Hoffman and the business associate profited from by contacting multiple governmental agencies and racing bodies.

In his own words, Clark knew he had the power to hurt a business over social media. After he was fired but before he started regularly attacking Hoffmann, Clark was in contact with Hoffmann Innovation's technical support and engineering supervisor, asking about another company that Clark believed may have copied Hoffmann's product. Clark told the supervisor, "Well, just let me know if the attorn[eys] can't do anything worthwhile. Because I could make a single post on FB about it and wipe them out. Lemme know what [Hoffmann] wants to do about it i.e. if you need the Court of Social Media." When the supervisor responded that Hoffmann was out of town, Clark responded, "I will contain my vengeance, but you let me know it's time to open a can of Fuck Them." Substantial evidence supported the attempt to extort. "[G]eneric" extortion is defined as "obtaining something of value from another with his consent induced by the wrongful use of force, fear, or threats." *Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 409 (2003) (citation omitted).

And Hoffmann argues Clark failed to preserve error on the jury's award of this element of damage. We agree. "Thus, like the old adage that every dog is

entitled to one bite, every trial judge is entitled to one-but only one-chance to prevent or correct error in the record." 12 Barry A. Lindahl, *Iowa Practice Series*: *Civil & Appellate Procedure* § 43:13 (2020 ed.). Clark's post-trial pleadings are void of any objection to this damage award. Therefore, we will not disturb the damage award of $250,000.

**Libel per se for Hoffman Innovations.** The jury awarded Hoffmann Innovations $2,060,250 from both Clark and RealTuners for libel per se. Clark argues these awards are not supported by evidence and are flagrantly excessive.

"In case of statements that are libelous per se, damages for mental anguish or hurt feelings are allowed because damage to reputation is presumed." *Schlegel v. Ottumwa Courier*, 585 N.W.2d 217, 222 (Iowa 1998). These statements are actionable without proof of damages. *See Rees*, 461 N.W.2d at 839. Specifically, "[s]landerous imputations affecting a person in his or her business, trade, profession, or office are also actionable without proof of actual harm." *Lara v. Thomas*, 512 N.W.2d 777, 785 (Iowa 1994). "However, recovery is limited to 'those damages which were a natural and probable consequence of the original [defamation] or its repetition or republication.'" *Rees*, 461 N.W.2d at 839 (citation omitted). While proof of damages is not required to recover, the jury must have some evidence with which to determine the consequences of the slander, like "the extent of the publication." *Id.* (citation omitted). Juries are not limited to awarding purely reputational damages for libel per se; "a plaintiff can recover other actual damages such as loss of income, emotional distress, physical pain and suffering, medical and hospital services attendant to mental anguish, and for personal humiliation and embarrassment." Patrick J. McNulty, *The Law of Defamation: A*

*Primer for the Iowa Practitioner*, 44 Drake L. Rev. 638, 653–54 (1996) (citing *Vinson v. Linn-Marr Comm. Sch. Dist.*, 360 N.W.2d 108, 120 (Iowa 1984)).

At the start, we refer to a perception offered by our supreme court when it indicated "[w]e are not persuaded, however, that the Internet's ability to restore reputations matches its ability to destroy them." *Bierman v. Weier*, 826 N.W.2d 436, 454 (Iowa 2013). Quoting a case from the New Jersey Supreme Court, *Bierman* noted:

> In today's world, one's good name can too easily be harmed through publication of false and defaming statements on the Internet. Indeed, for a private person defamed through the modern means of the Internet, proof of compensatory damages respecting loss of reputation can be difficult if not well-nigh insurmountable. We question why New Jersey's longstanding common law tradition of presumed damages—for defamation claims by private citizens on matters that do not involve public concern—should be altered now to force an average citizen to ferret out proof of loss of reputation from any of the world-wide potential viewers of the defamatory Internet transmission about that otherwise private person. We are not persuaded that the common law of this state need change to require such victims to demonstrate compensatory losses in order to proceed with a cause of action.
>
> In sum, private persons face the real risk of harm through the modern ease of defamatory publications now possible through use of the Internet. Presumed damages vindicate the dignitary and peace-of-mind interest in one's reputation that may be impaired through the misuse of the Internet. Permitting reputational damages to be presumed in a defamation action arising in that setting serves a legitimate interest, one that ought not be jettisoned from our common law.

826 N.W.2d at 454 (quoting *W.J.A. v. D.A.*, 43 A.3d 1148, 1159–60 (2012)). And recently the Supreme Court warned, "Today, one of the most important places to exchange views is cyberspace, particularly social media . . . ." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735–37 (2017) (deeming social media the "modern public square"). Social media sites like Facebook give users a low-cost

and easy way to voice their views. *Id.* at 1735. "However, users must be aware that they could potentially be liable for their online speech." *Bauer v. Brinkman*, ___ N.W.2d ___, ___, 2021 WL 1431671, at *4 (Iowa 2021). And even in 1990, our supreme court appreciated that especially for a sole business owner, "the natural and probable consequences of statements challenging [the owner's] integrity are that customers will stop doing business with his company" and that "his business could suffer greatly." *Rees*, 461 N.W.2d at 840.

Pointing to Hoffmann's failure of proof, Clark argues the actual damages cannot be recovered "until and unless damage to reputation is shown," which he says was not done. *See* Patrick J. McNulty & Adam D. Zenor, *Iowa Defamation Law Redux: Sixteen Years After*, 60 Drake L. Rev. 365, 389–91 (2012). Yet Hoffmann presented evidence upon which the consequences of Clark's slanderous statements could be judged. Supporting the reputational injury, the words of potential customers in the social media posts established the dramatic impact of Clark's campaign. Supporting the actual-damage claim, Hoffmann and his wife testified about the stress, lack of sleep, and distress caused by the campaign. And evidence of the two-year daily fight to respond to returns of merchandise, allegations of problems with the product, and tracking negative comments about the company proved the adverse impact from both a financial and reputation vantage point.

Here, Hoffmann testified at trial as to just some of the posts Clark had written and shared, including ones that included statements Hoffmann Innovations was selling knowingly faulty products, the products ruined engines and caused cars to start on fire, Hoffmann Innovations employees were being paid to lie to

customers about the products, and that people speaking positively about Hoffmann Innovation's products were all being paid to say those things. Hoffmann introduced at trial a video that Clark had a friend edit that was put online. The video has a scene from the movie Inglourious Basterds, and includes an actor portraying Adolf Hitler and screaming maniacally. Clark's friend edited subtitles under "Hitler" to be Hoffmann saying things about Hoffmann Innovations knowingly selling failing products and covering it up. At trial, Hoffmann testified the video made a mockery of him and suggested customers who lost respect for Hoffmann had stopped purchasing his products. He also provided numbers of followers or "friends" for some of the sites and pages Clark was posting on, including the MegaSquirt Engine Management Club, which had 13,000 followers; RealTuners' business page, which had nearly 5000 followers; Clark's RealTuners podcast, which had 2370 members; and TurboBullet, an industry page with approximately 120,000 followers. Hoffmann also testified as to how followers were interacting with these pages; some would "like" or comment on Clark's posts, which caused others to get involved with his posts. Additionally, it was unclear how many nonparties were seeing and sharing these posts to their own pages or other places on the internet, possibly expanding the potential audience.

Hoffmann also testified about the impact Clark's posts and the resulting rumors were having on his business, including the number of products being sent back because clients were afraid of the issues Clark listed. Several of Hoffmann's paid employees spent their full-time hours working to test products and get them sent back to customers with the assurance they were working properly. His marketing team had to focus on fighting the negative stories and rumors that were

circulating about the products rather than working on campaigns to move the company forward. Attributing this disruption to Clark, Hoffman estimated his employees spent time every day countering this barrage of social media posts. Hoffmann testified it was hard to know what customers stopped buying his product or would now never buy his product based on the falsehoods they heard, although he was able to point to some posts on social media where nonparties made exactly those statements. He also testified about a business relationship he lost as a result of Clark's lies; Motion Raceworks were resellers who were buying $10,000-$15,000 worth of Hoffmann Innovation's products each month but then stopped. Hoffmann testified that at the time of trial, that relationship had been lost for twenty-five months, so his conservative estimate was that the company lost $250,000 in revenue[22] from that discontinued relationship alone. He also testified Motion Raceworks had grown during those twenty-five months so he believed their monthly orders would have increased if the relationship remained.

Taken as a whole, Clark engaged in a relentless campaign to destroy and punish Hoffmann. "The doctrine of presumed damages developed because proof of actual damage was believed to be impossible in many cases when, from the character of the defamatory words and the circumstances of publication, it was certain that serious harm in fact resulted.." McNulty, 44 Drake L. Rev. at 300. Likewise, repetition of a defamatory message may be shown "in aggravation of damages." *See Rhynas v. Adkisson*, 159 N.W. 877, 880 (Iowa 1916).

---

[22] Hoffmann testified 40% of the revenue would have been profit.

Here, Hoffmann asked for $4,500,000 for the loss in the company's reputation, which he explained in part based on the company's lost revenue. Summarizing his position, Hoffman said,

> I considered how many years of blood, sweat and tears, sacrifice have been poured into this business. I considered how my customers have responded to the way that we've taken care of them for almost 15 years now, and I looked at how they're talking about me now, and I looked at the loss of revenue that's occurred since Mr. Clark began this campaign of terror, and I came up with the best number that I could.

On the subject of loss of revenue, he testified that he came up with that amount by determining Hoffmann Innovations growth rate before Clark's attacks began, which he determined was 23%. Using a more conservative estimate, 20% growth, he compared the company's actual revenue at the time of trial compared to what it would have been worth if the growth rate continued unabated. The jury also heard Hoffman address the long-term impact of the slander:

> Well, the company, I mean, we've hit—we've been damaged so much that, I mean, I'm only so far quantifying the losses until today. It's gonna take years to rebuild this, and I don't think I'll ever replenish that name with a large number of people that used to adore us, and, honestly, I don't believe Clark is gonna quit, so I don't—I don't know how we're gonna get out of that hole.

Based on all the foregoing, we reject Clark's contention that the jury's award was overly speculative. *See Pavone v. Kirke*, 801 N.W.2d 477, 495 (Iowa 2011) (providing that "damages are denied" "if the evidence is speculative and uncertain *whether damages have been sustained*" but "if the uncertainty merely lies in the amount of damages sustained, recovery may be had if there is proof of a reasonable basis from which the amount can be inferred or approximated"). And because we believe the amount awarded is supported by the evidence presented,

this is not a flagrantly excessive verdict that "raises a presumption that it is the product of passion or prejudice." *WSH Props., L.L.C. v. Daniels*, 761 N.W.2d 45, 50 (Iowa 2008).

**Libel per se for Hoffmann.** The jury awarded Hoffmann $500,000 from both Clark and RealTuners for libel per se. Clark challenges these awards for similar reasons as the award to Hoffman Innovations. But the posts Clark was making public to large groups of people also included attacks against Hoffmann personally, so his personal reputation is also presumed to be damaged. *See Schlegal*, 585 N.W.2d at 222. Hoffmann presented strong evidence of the harm he suffered from the antics of Clark. The social media posts with photographs of Hoffmann, about which Hoffmann could not respond, along with other inflammatory posts, tore at Hoffmann's personal reputation. *See State v. Poston*, 203 N.W. 257, 258 (Iowa 1925) ("Roughly stated, character is what a man actually is, while reputation is what his neighbors say he is."). And Hoffmann and his wife both testified to the toll Clark's actions took on Hoffman, stating Hoffmann was having trouble sleeping, "stressed to the max all the time," and consumed by how to deal with the attacks. Hoffman's wife noted, because Hoffman followed the terms of the consent order, "these attacks would come in, he couldn't respond to them. . . . He had to sit and watch his reputation be torn apart online and not say anything about it." Substantial evidence supports this jury award.

**Punitive Damages.** The jury found Clark liable for $2,000,000 in punitive damages and RealTuners liable for $3,500,000 in punitive damages. Clark asserts these are not justified, but he does not articulate a clear argument or cite authority in support of his current position against these specific damages, so we do not

consider them. *See Hyler v. Garner*, 548 N.W.2d 864, 876 (Iowa 1996) (holding appellate courts will not speculate on arguments a party "might have made and then search for legal authority and comb the record for facts to support such arguments"). While these damages are high, Clark cannot be held to complain as it is his relentless behavior that warranted such a punishment. And his disregard of clear directives from the district court to stop violating the consent order further supports these punitive damages. Here, the district court patiently counseled Clark about his behavior and he voiced understanding, yet he could not contain the inflammatory messaging that brings us to this point today. Clark can blame only himself for the relentless attack mode he pursued and the award of damages of this magnitude.

We affirm each of the jury's award of damages.

**D. Award of Attorney Fees.**

Clark challenges the district court's award of attorney fees to Hoffmann and Hoffmann Innovations. "Whether to grant common law attorney fees rests in the court's equitable powers," so our review is de novo. *Williams v. Van Sickel*, 659 N.W.2d 572, 579 (Iowa 2003).

It appears Hoffmann first raised the issue of attorney fees in the unreported pretrial conference on August 16.[23] In response, Clark filed a motion to deny the request for attorney fees, claiming, "Unless attorney fees are allowed by statute or contract, the plaintiffs cannot recover fees." He asserted the noncompete

---

[23] We make the assumption as we have found no filing in the record where Hoffmann requested attorney fees for the litigation, and Clark filed his "motion to deny attorney fees" on August 19, in which he claimed Hoffmann was "requesting the court and/or the jury to award" attorney fees.

agreement did not provide for the award of attorney fees and no statute applied, so Hoffmann's request for fees should be denied. Hoffmann then filed a response, outlining his claim that fees could be awarded "when a losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Hockenberg Equip. Co. v. Hockenberg's Equip. & Supply Co.*, 510 N.W.2d 153, 158 (Iowa 1993) (citation omitted). At trial, the parties agreed the issue of attorney fees was for the court to decide and that the court could take it up after the jury trial ended. Then, at the October 1 hearing on post-trial motions, the court heard argument about whether to award attorney fees. Hoffmann reiterated the court had the power to award fees if it determined they were appropriate and outlined some facts he believed supported the award. Clark responded, again stating that attorney fees are generally only allowed in Iowa where a statute or contract provides for them. Then, for the first time, Clark argued that because Hoffmann was relying on an equitable principle to be awarded fees, then "attorney fees should be broken down into what part of their attorney fees were incurred in getting the injunction, which is equitable relief, and what part of their attorney fees were incurred in getting the damages that the jury awarded."

Now, on appeal, Clark offers new arguments why Hoffmann should not be awarded attorney fees. He notes Hoffmann had the burden to prove "the culpability of the defendant's conduct exceeds the 'willful and wanton disregard for the rights of another'; such conduct must rise to the level of oppression or connivance to harass or injure another." *Id.* at 159–60. Clark claims Hoffmann failed to meet this burden "because they relied on Clark's conduct that was not the subject of their petition in order support of their claim for attorney fees." This is

Clark's first time arguing that the court was limited in what actions of his could be considered in determining if attorney fees were appropriate here. *See Fed. Land Bank v. Recker*, 460 N.W.2d 480, 482 (Iowa Ct. App. 1990) ("It is axiomatic that we will generally not consider issues raised for the first time on appeal.").

Insofar as Clark challenges the court's ruling that attorney fees were inappropriate when considering all of Clark's actions during the pendency of the case, we have little trouble concluding they reached the necessary level of conduct that was "difficult to bear, harsh, tyrannical, or cruel" and "intentional and likely to be aggravated by cruel and tyrannical motives." *Williams*, 659 N.W.2d at 579. We affirm the court's award of attorney fees.

**III. Conclusion.**

Because Clark and RealTuners have not established a reversible error, we see no reason to disturb the jury's awards, and we decline to consider the argument against the award of attorney fees as it is raised for the first time on appeal, we affirm.

**AFFIRMED.**